I'll just mention I'm going to take a shot at trying to save six minutes. May it please the court. My name is Michael King, along with Jason Anderson and Seth Wilson, who are with me at council table. I'm here today on behalf of the defendant, the Port of Bellingham. The court is appealing from a judgment on a jury verdict in favor of the plaintiffs Shannon and Nicholas Adamson. The Adamsons are cross-appealing, contending the district court should resolve their claims under maritime law. I will address the issues raised by the Adamsons' cross-appeal, but I propose to leave my remarks on those matters to my rebuttal when I will respond to what opposing counsel has to say on those points. In my opening argument, I propose to focus on the Washington law issues the court has raised in its appeal. As a threshold matter, I'd like to address the status of Washington landlord liability law. Now, by Washington landlord liability law, I mean the Washington common law governing claims against landlords for personal injuries arising within the area leased by the landlord to their tenant. As described by the cases the court cites in its opening brief, Washington landlord law is traditionally a highly restrictive law laying down a general rule of no liability and allowing only a few limited exceptions. The Adamsons claim these cases represent an archaic view that has been, quote, severely restricted, close quote, by the Washington Supreme Court. The Adamsons are wrong, and Frobig v. Seattle, a case they cite, proves they are wrong. The facts in Frobig were bad for the landlord, and by that I mean they offend contemporary notions of better conduct. In Frobig, the landlord knew, yet did nothing about the dangers to the public posed by the tenant's business. The tenant was operating a wild animal park with animals as dangerous as a tiger named Sultan, and Sultan got loose and mauled a member of the public. The trial court dismissed the claim against the landlord. The court of appeals reinstated. The Supreme Court reinstated the dismissal unanimously. The plaintiff asked the Supreme Court to liberalize the law of landlord liability by adopting a duty to act against dangerous conditions created by the tenant, based on some cases from New York and California. The Supreme Court refused to do so, rejecting the notion that landlord liability should turn on concepts of better conduct. In the final paragraph of its decision, the court stated, the issue of the branch's duty to Clara Frobig is not a question of fact, as the court of appeals found, nor is it a question of morality, as the California court suggests. Rather, the issue is a matter of law, and we conclude that landlords have no duty to Well, it seems like the question here is whether the passenger ramp area was a common area, so that the landlord did have some responsibilities to business invitees, or whether the passenger ramp area was in the exclusive control of Alaska here, and so was the regular landlord tenant law, as limited as you described, would even apply. So could you address that issue? Absolutely, Your Honor. The common area question goes to what I would describe as the second pathway to liability that was established under the verdict form. I've got to deal with three pathways. Business invitee, which was an independent basis under the verdict form, common law duties of the landlord, which was a second independent basis, and finally, the breach of the lease. So turning to the common area, I think we can dispose of that pretty quickly. The district court held that that was implicated in this case because, at various times, the port and the ferry system, the landlord and the tenant, were using the area. But that's not a common area under Washington law. The definition under Washington law is clear, Geis v. Lee. A common area is someplace where multiple tenants come together and they're using the area on a matter of equal right. So the port reserved the right to allow other ferry systems, I guess, to use that berth and that passenger ramp. Yes, the port did do that. And that goes to the question of how business invitee law got into this case. It's not a common area any more than in a building where you've got a bunch of law offices and a lobby. The lobby is the common area, but the fact that the landlord might go into an individual firm's law office from time to time doesn't make that office a common area. But Alaska didn't have exclusive control of that berth, right? Under the lease? Yes, they did have exclusive control. Why is that? They had exclusive control when they were in port. The district court, and this goes to the problem of business invitee law getting interjected into this case. The district court interjected business invitee law, which is a concept of premises liability, not landlord liability. And the first reason for doing so is exactly the reason that Your Honor is pointing to. The district court said, look at the lease, all the ferry system gets in terms of the docking and ramp facilities is a preferred use. And the district court erroneously stated that this was a preferred use that only applied when the vessel was in port. The structure of the lease is very different from that. The preferred use was a right that extended for the 15-year period of the lease. When the vessel is in port, it is an exclusive use. And of course, that's how the ferry system operates. They're not there seven days a week, 365 days a year. They are there for two times during the high season a week and one time during the off season a week. However, when they're there, they have exclusive use. Yes, the landlord had the theoretical right, the port had the theoretical right, never exercised, but it's there, to lease the use of that dock and ramp area to somebody else. But that use, that right, could not interfere with the port's rights. You can't reasonably read this lease as establishing some sort of right in the port of Bellingham to set up a structure so it's sort of first come, first use, first pass the post. That wouldn't work for the ferry system. What are we to make of the fact that the port had exclusive control over repairs and maintenance of the facility? The port was under a duty to repair and maintain. The port had to fulfill that duty. The port had no right to do that when the ferry boats are in port. They're supposed to do that afterwards. So for example, if we talk about the ramp structure, we're there once a week during the winter season. So if there's a maintenance issue or if there's a regularly scheduled maintenance, then the port's people are going to come onto the ramp when we're not there. We're there for a 12-hour period and then we're gone, maybe for several days. So they have the obligation and they have the opportunity then to do that. But they can't come there when we're there, when the ferry system is there, when the ferry system is doing its ferry system business. But if they have control over the maintenance and repair, that can have a significant impact and effect on the lessee's use of the property. No, Your Honor. It's a common right of landlords, not right or obligation, that they can assume. They have no obligation to repair under the common law. But if they assume that obligation, they carry that obligation out in a way that doesn't interfere with the lessee's possessory rights. There's no evidence in this record suggesting that the landlord had a right to say, oh, it's maintenance time, you can't bring your ferry vessel in even though it's scheduled to arrive in three hours. That type of scenario just doesn't play out. I think the Barnett versus Lincoln decision of the Washington Supreme Court is particularly instructive on this question, the interplay between the fact that you've got a dock in that case. Here we've got a berth. And in Barnett, the question was, did this canning company have a lease? And one of the rights the canning company had was a preferred use of the dock. When they brought their vessels up to offload the salmon, which would then be taken into the facility where the salmon would be converted into canned salmon, they had priority rights. Nobody else was supposed to be there. But during a time when they're not there, the Port of Seattle was welcome to invite others in. Similarly here, the structure of this lease is that when we're not using it, they could enter into a lease arrangement, and under that lease arrangement, some other vessel owner would be entitled to berth there. But they can't interfere with the operations of the ferry system. The ferry system has a schedule. The ferry system has that preferred right. That right is for 15 years, and when they're there, it is an exclusive right. I do not think that you can reasonably say that the ferry system didn't have the normal rights of a lessee, and that this was somehow merely a license. Now, the district court had another reason for interjecting the concept of business invitee. And the other reason for interjecting the concept of business invitee had to do with this FOA case. And the notion that the relationship here was somehow such, and that the port had such rights of control that this is comparable to a FOA, and so it takes it out of the normal course of landlord-tenant and makes it an invitee case. The problem, of course, is that a FOA is a premises liability case. The Port of Seattle did not lease Sea-Tac Airport to somebody and then collect rent. The Port of Seattle ran Sea-Tac Airport. That's why a FOA was a business invitee case at all, why the issue was posed. Because it was a premises liability case, the Port of Seattle owed some duty to Mr. AFOA. The question was, under Washington's licensee classifications approach to premises liability, the question was, was he a mere licensee or did he have the rights of business invitee? Now, and additionally, AFOA was there to participate in the airport's business. In fact, AFOA's presence was essential to the airport's business because he was driving one of those little vehicles that moves airplanes around. Here, the business of the port is running a port. The business of the ferry system is operating a ferry system. Ms. Adamson is engaged in her employer's business. She's not engaged in the port's business. I think the district court just got it wrong as a matter of law in suggesting that we don't have a lease situation. Implicitly, she was suggesting it was a license. I think she's just wrong about that by misanalyzing the fundamental structure of the lease. And I think the district court was also wrong to suggest that somehow AFOA concepts meant that this was a premises liability case. Now, that would take the first path to liability off the table, that this is not a business invitee case. I understand there was a safer mechanism that could have been installed. Who made the decision not to install that? The decision made not to install it as a matter of repair was the port. The port made the decision not to install it. And by the safer system, what we mean is not that the mechanism itself is unsafe. The issue arises because of operator error. The mechanism is fine. However, there is this issue of operator error. So if you want to take the operator error possibility out entirely so that even if somebody pushes the buttons incorrectly the way Chief Mate Preston pushed it, you won't have a problem. You install this interlock. That was the proposal. And that was ultimately done way down the line, well after the Adamson incident. So under the contract, I guess the third method of liability was the obligations of the port under the contract. Right. And the court appeared to think that the, that the, without the additional safeguard, the mechanism that operated the passenger ramp was a hazard. And therefore, the failure of the port to install the additional safeguard violated its contractual obligation. What's wrong with that analysis? What's wrong with that analysis, Your Honor, is it's based on the district court's assumption that there was a public policy that precluded the port from even arguing that you could construe and interpret the intent of the parties to this contract to be that when this lease was entered into in April 2009, the parties did not intend that the port was taking on an obligation to change the mechanics of the device for lowering the ramp to get rid of the risk that operator error would produce this ramp drop. The district court said there was a public policy in Washington. You just can't, you can't argue for that interpretation of the party's intent. And is there any state case that would say having a mechanism that due to operator error could cause serious injuries constitutes a hazard as a matter of law? Is there a state case that would support that? There is no statute that says that parties can, landlords and tenants cannot make that decision. There is no case that says landlords and tenants cannot make that decision. That's because the cases in Washington, the common law rule is landlords have no duty at all. They have no duty of repair. They have no obligation to the employees or the tenants. Now one of the exceptions under the common law is the landlord can contract for more. Well, fine. So the landlord could take on some obligation of some scope. But that then becomes a matter of the classic contract formation issues and the freedom of contracting. How far does it go? What did the parties intend? Now here there was this issue of the hidden defect. And this court in Younger v. United States said under Washington law, a hidden defect is a dangerous condition. So the issue here is entering into the lease in April 2009, did the landlord still have a duty to notify a hidden defect, about a hidden defect? That takes us to the Preston incident of October 2008. Chief May Preston is the first person in almost 20 years under a 20-year lease who misoperates this, creates the slack, pulls the pins, and the ramp drops. Now everybody knows there is this thing. And immediately the port advises the ferry system, here is the nature of the problem. If there's misoperation, cable will be released, slack will be created. If the pins are pulled, then there will be this ramp drop. And somebody could be injured. Preston kept his balance. But somebody could be injured. This is a safety risk. Now, that's a full disclosure of the dangerous condition. The plaintiffs tell you, no, no, what needed to be disclosed was this full scenario outlined in the Geiger report. The problem with that, of course, is that's confusing the worst case result from a defective condition with a defective condition. It also ignores, since we're talking about the common law exception to the general rule of no duty, that the duty only extends to notice. The Geiger report wouldn't even have existed if the port hadn't gone further and under the lease assumed the duty to repair. But when we're talking about the duty to notify, that's all it is, is a duty to notify. The report didn't have to be generated within the context of that particular exception, much less passed along. Moreover, Captain Falvey admitted in his testimony, and this is ER 873, 874, and 875, that even without the Geiger report, he knows things could be much worse. He knows that this could drop at least a few feet. Well, if it drops three feet instead of the feet and a half in the Preston incident, that's twice the drop, twice the force being exerted on the man to the left and down. That substantially increases the risk that somebody in Preston's situation would be thrown to the left and against the edge of the ramp and seriously injured. I submit that as a matter of law, the hidden defect claim shouldn't have been submitted to the jury. I've addressed common area. The next issue under the common law is this notion that this was a multi-member, multi-worker workplace. This was like a FOA. Of course, the problem with that contention is all you have to do is read the Washington Supreme Court's decision. Justice Wiggins was very careful at the end to say this must not be interpreted too broadly. You only have liability in this area, this is even assuming you would apply it to a landlord, if the landlord or the party is in the same position as the port was in a FOA. The port was running the show. The evidence here is that under this lease and at the time of the Adamson incident, the port had no right to go on, onto the site when the ferry system is there with its boat, no right to direct about how these people did their jobs, including the operation of the ramp. So that brings me back to the contract. Now the problem with the contract case as it unfolded is the judge got this notion of public policy in her head. I think that's because she was thinking about the public policy of business invitee law, which she'd applied, which shouldn't have been there. So as a result, we weren't allowed to put on extrinsic evidence. Now once you realize there's not a public policy bar to applying the context rule in Washington, the issue simply becomes under Berg and Hurst, were we trying to alter, vary or contradict the contract by what we were suggesting? Repair doesn't get them anything. Repair means to restore the status quo. The Geiger report says what they wanted was an upgrade. So it all comes down to this question of the mechanical hazard clause. What is a mechanical hazard? I think a reasonable reading is a mechanical hazard is a problem with the mechanics, not a problem with operator error producing a situation, but with the mechanics. So if there was corrosion in the ramp cables, we'd be obligated, once that was discovered, to eliminate it under that clause. Now that's a reasonable interpretation. The Adamson's say, no, no, a mechanical hazard arises any time the operator can screw things up and cause a problem. Well that's a little difficult to reconcile with the totality of the context and the relationship of these parties. But I'll grant it's a reasonable interpretation, but where's their extrinsic evidence to support it? We wanted to introduce extrinsic evidence of course of conduct, which would have established that the parties did not intend to impose the obligation to replace the mechanics by this clause. Consider the episode after the Adamson accident when Captain Falvey, knowing the thing has been rebuilt, as is, with no interlock, tells his people, you don't operate this, we'll have our longshore contractor do it. He doesn't come and say, now we know there's a mechanical hazard, it can drop all this away, replace it. We've got a strong case at least under the extrinsic evidence. We retry the contract issue that we didn't assume the duty. I don't think they've got any evidence, and I think you should grant us judgment as a matter of law in any event. But if you decide as a matter of fairness, applying the Neely decision that gave the circuits the right to grant appellate judgment as a matter of law, and remand and give them a chance to produce some extrinsic evidence. That means at best they come out of this case with a retrial on contract only. And I've seen I've taken up all of my time. There were a lot of issues to cover. I appreciate your time and attention. If I might get a minute at the end, I would appreciate it. Thanks, Mr. Talmadge. What we'll do is I'll be a very relaxed presiding judge. We'll give you two minutes for rebuttal even though your time's up so you can plan it. Thank you very much, Your Honor. I do need to make that go. Thank you. And good morning. May it please the court, Phil Talmadge here representing Nicholas and Shannon Adamson. I thought the court's presentation was remarkable for many of the factual misstatements that were made to the court regarding the circumstances of this case, and I wanted to correct some of those right at the outset. First of all, the court knew of the collapse risk, and it took no steps to deal with that appropriately. In response to your question, Judge Tonheim, it was the court's responsibility, it required a single wire that would have required 15 minutes of an electrician's time to install to interlock the controls to prevent this situation from occurring. When you say it was the court's responsibility, are you saying that based on contract or based on common law? I think based on both. But let me hasten to answer the question that you raised, Judge Okuda, which was the question, is there a case in Washington law regarding the retention of instrumentalities that establishes a liability, and that is a FOA and a FOA II. In those cases, the question was whether or not the port retained control over the instrumentality as the harm to Mr. OFOA, and in fact that was the conclusion of the Washington Supreme Court and the Intermediate Court that that was a basis for liability. There was language, though, in that case saying that the port retained exclusive control over the airfield area, and so it seemed to be not exactly on point here. Well, I think it is on point, and I think this is one of the major and central misstatements that counsel made about the OFOA case. He said there was no lease in the OFOA case of the tarmac to anyone. That's wrong. In fact, in that case, there was a lease by the Port of Seattle to the various airlines. This was the airline area, as it was described in the Supreme Court opinion, and then, in turn, the airlines had service organizations that helped them handle the baggage and the movement of equipment on the tarmac. That was EGLE, and OFOA was EGLE's employee. Yeah, I understand that factual issue, but it says in the opinion in a couple of places that the port retained exclusive control over the airfield area and really just assumed that OFOA was a business invitee rather than a licensee. That seemed to be what they were focusing on. Well, it was a matter of law that he was a business invitee. They didn't seem to focus on an issue analogous to this, where there was a question whether the airlines had actually exclusive control, or EGLE obviously didn't have exclusive control, so it didn't seem to me exactly on point there. It's not exactly on point, but this is the one statement that I think stands, and that is the argument that the port makes is, oh, there's a lease, and so we have no more obligation under the common law. We have no more obligation under principles of multi-employer worksite safety to do anything other than what's in the contract itself. OFOA defies that point. They argue that, in fact, Alaska had exclusive control of the dock and the passenger ramp during the time when it was using it. Can you address that and what's wrong with that analysis? Absolutely, and I'd be happy to. The contract is clear here in multiple places as to what the responsibility of the port is. You look at paragraph 4.1 of the agreement to begin with, and it says, the responsibility for keeping the lease premises in good repair and tenable condition is solely, solely the responsibility of the port. So we start with that. But that doesn't say about control. I mean, we have other cases like in Reagan and I guess Hughes v. Chihala School District where the landlord retains the authority to go in and supervise and even be on the premises, but the Supreme Court, Washington Supreme Court there, said that the lessee, even for an evening, I guess, in Reagan and for a day in Hughes, was the tenant, and so the landlord... Paragraph 5.18 of the agreement, Your Honor. To permit the lessor to enter upon the premises at all reasonable times to examine the condition of saying... So didn't they have that in Reagan as well? My understanding is that the superintendent reserved that authority to have access at any time. They reserved the right at all times. But they said that didn't change the fact that it was a landlord-tenant relation. Well, but there are other provisions in the lease I'll get to in a moment, but my point is the argument that, oh, we can only deal with this when the, we're deprived of doing anything when a vessel is in port, is defied by the language of the agreement that gives them at all times the right to enter upon the premises. The next paragraph that I'd point the Court to is paragraph 4.5, the operations manual. The Port had an obligation to prepare an operations manual for the use of ramp operators in connection with the ramp at issue here. More to the point, it says... Does that go to landlord-tenant, or does that go to something else? Well, it goes to the question of exclusive control, which was the question you asked, and that is, it says here, quote, the State shall operate the car and passenger ramp in compliance with the procedures, specifications, and other requirements contained in such operations manual, as the same may be revised by the public... The State is Alaska, right? So it's Alaska who's operating the ramp? No. This is the State.  It's Alaska that's operating the ramp. It's Alaska. So it's the tenant, not the Port. In accordance with the operations manual that the Port of Bellingham prepares. Well, if you're the landlord and you have an air conditioning system, you might tell the tenant, don't screw up my air conditioning system in the apartment, and here's the operating manual. So I don't see how that changes a landlord-tenant relation. It goes to the question of exclusivity of control here. Does the landlord have control just because it says, don't screw up my air conditioning system? Well, no, this is a lot more than that. This is how you're going to operate the ramp, and this is the point of a FOA, scrolling back to a FOA. In that case, the Port of Seattle had an operating agreement for the people on the tarmac, and people like Eagle, the employer of Mr. Afoa, had to subscribe to that standard that the Port of Seattle established. It's no different here is the point. There was to be an operations manual that the Port of Bellingham created, and the Alaska Marine Highway System was supposed to operate the ramp in accordance with that manual that the Port of Bellingham prescribed. And then the last contractual provision is paragraph 4.7 with respect to accident hazards. The lessor will maintain the lease premises free of structural or mechanical defects and in accordance with applicable building codes. The sum total of all of these contractual provisions belies the argument that there was exclusivity of control over the ramp by Alaska. The exclusivity of control over the ramp operations rested with the Port of Bellingham. And it was at most a factual question, and the jury determined, in accordance with appropriate instructions on Washington law that the Port of Bellingham itself often asked for, that in fact this was sufficient to establish liability. Didn't the lease give Alaska exclusive control over some areas such as office space and warehouse space or something like that, which could be distinguished from this priority use of the ramp? The lease specifically distinguished between exclusive use and priority use. And counsel's argument that no one from the Port was there 24-7 is simply wrong. You'll see the recitation of the facts in the fourth brief that we submitted. But it's very clear that this is a large marine facility. The Port had obligation, it had security people present, it had parking spaces present. All of this was allocated in accordance with the lease. So the parties allocated all of that. And the Port was there and present at all times. But the Port says that nobody could use the dock and the passenger ramp when Alaska was there. Is that wrong? I would think it would be difficult to have two vessels using the same ramp at the same time, obviously, Your Honor. I think the idea was that you had exclusive use when the ramp was there. Certainly, you'd have to have that, it's just a matter of practicality. But the point is that the ramp could be leased at other times when the Alaska Marine Highway System was not using it to another party who might want to use it. And that was an authority that the Port retained. Counsel, Mr. Talmadge, remind me from the record, what would it have cost, does the record show what it would have cost the Port to fix the ramp so that the accident could not have happened? Less than a thousand dollars, Your Honor. One wire and about 15 minutes of an electrician's time to interlock it. And the Port did interlock it subsequently, as counsel admitted. It was a simple repair that would have prevented this horrendous injury to Ms. Adamson. Let me turn to a couple of misstatements of the law that the counsel made that I think are crucial to the court's consideration. One other factual point, counsel again talked about operator error and I wanted to point out and remind the court, of course, that the jury exonerated Ms. Adamson from any liability and exonerated Alaska from any liability as well. So 100% of the fault was attributed to the Port of Bellingham. So the argument about operator error on Ms. Adamson's part is simply a red herring. Was Alaska a party at the trial? I don't believe . . . Empty chair. It was an empty chair. I thought Alaska . . . I thought in the state court, Alaska has sovereign immunity and so . . . That's correct, Your Honor. . . . was not a party. That's correct. So it was not their . . . Okay. Yeah. There was a jury instruction and there was a place for the opportunity for the jury to attribute fault to the empty chair, which is permissible under Washington tort law. And that didn't occur in this case. In terms of the liability, let me say first that there are multiple means of securing liability that would affirm the jury's verdict in this case, the judgment on the jury's verdict. The first is, of course, the common law. And counsel wants to argue that there's no common law responsibility at all simply because there's a lease. A FOA puts the lie to that argument. As I pointed out in response to Judge Akuta's question, a FOA is a case in which there was a lease and the Washington Supreme Court did not see any problem whatsoever in still finding both premises liability and liability for an owner's responsibility to maintain a safe workplace. Did they discuss the lease in that case? I don't . . . I don't recall. They did not. They did not, Your Honor. That wasn't really an issue in that case. It was not an issue. But if . . . I presume that if the court had seen that as an issue, it would have surfaced. It would have been something that at least would have merited a footnote to say, this is why we're not addressing that issue in this case. They didn't even . . . they didn't even trouble with the issue. Were the airlines being sued in that case? They were the tenants there. They weren't initially. But in the second . . . in FOA 2, the intermediate appellate court decision, in fact, fault was attributed to the airlines. Significant fault. And one of the significant questions in that case was whether or not under the nondelegable duty notion, there could be fault attributed to those airlines. And the court of appeals in that case said no. That's an issue that may still be before the Washington Supreme Court on review. The point that I simply wanted to make is you can have liability as a premises owner for a variety of circumstances, notwithstanding the fact that there's a lease. You can still retain liability under the common law for retained instrumentalities, the instrumentality of harm, or when you open up your premises to the public, as was the case in this case. Here you have the instrumentality of harm. The ramp is something that was the responsibility of the port to deal with. So would that require us to say that the passenger ramp was analogous to a common area? I noted in your brief the cases you cited where landlords were liable to people coming on the property were when it was the common area. I think you can draw an analogy to the common area. If they retain responsibility for an instrumentality of harm, I think it's analogous to the responsibility that's retained for a common area by a landlord. So like in that Hughes v. Chihalas case, that opposing council site, the school district rented out the school for some guild activity, and in the kitchen there was a recessed tile area where the coffee maker was, and the person claimant stepped on it and tripped and fell, and the Washington Supreme Court said the landlord had no liability at all for that because it had leased the area and that instrumentality of harm, the recessed coffee maker, I guess, to the guild for that day. Why isn't that controlling? That's opposing council relies on that. Hughes was overruled subsequently, at least sub silentio, in McKinnon, a case on business invitees. You have a liability as a business or public invitee under Washington law, and Hughes is an old case. I'm not familiar with McKinney, but is that... We cited it in our brief, Your Honor. Was that a common area that was involved, or was it a... It was a business invitee case. Was it a common area? What was the area where the person got hurt? You know, off the top, I don't recall. Okay, because most of the cases I looked at, the ones you cited, and they all involved common areas, so they're distinguishable unless this is a common area. Well, you have a continuing responsibility, and there are cases that establish that under the common law. A perfect example is Ford. It's the Red Lion Hotel, leases an area of its parking lot. Somebody comes, the tenant comes into the parking lot, the employee of the tenant is injured in the parking lot. There's no problem in holding that hotel liable. That seemed like the best case, but that was a Court of Appeals case, right? So it really couldn't... It was specifically approved of, its language specifically approved of, Your Honor, in EY versus State by the Washington Supreme Court. And again, we have the case of Afoa, which says, as a matter of law, Mr. Afoa was there on the site of the Port of Seattle, doing the Port of Seattle's business, advancing it. We have numerous cases of the Washington Supreme Court upholding, as a matter of law, the principle that a tenant is a business invitee of the landlord. Other than Red Lion, are there any which didn't involve a common area? Because Red Lion, I think, is your best case on that. I think it is too, but I think Afoa is pretty close to that, Your Honor. I mean, it's a site, a leased site, the airfield site leased to the airlines, and you have the operator... But the court said that the port retained exclusive control over the airfield area, so... Well, and we'd argue that the port here retained essentially exclusive control over the instrumentality of the harm, the ramp that's at issue here. I mean, it had every responsibility with respect to the appropriate safety attached to that device. The other case, again, to point out is that you have this multi-employer worksite situation. It's a common issue under Washington law. Afoa said it's an opportunity for liability. It was clearly indicated in the most recent decision of the Washington Supreme Court on premises liability related issues. We believe that Afoa controls on that issue as well. With respect to the latent defects, the liability of the port as a landlord, I wanted to touch upon that. Counsel does concede that the port can have liability under those circumstances for latent defects as well as for covenant repairs. First, with respect to the latency of defect, counsel misstates Washington law. Washington has adopted the principle of the Restatement 358, Restatement Second of Tort Section 358 regarding latent defects. And that is, you don't know of the condition, but rather the harm that is the issue that's at stake in the case. Counsel's argument is you just have to know the condition and that's enough. There's a case that we'll cite by way of supplemental authority to the court, a case called Ravenscroft. It's a case involving a specialized statute in Washington law immunizing people who open their land to recreational users. In that case, the court distinguished between the common law and the statute that was at issue there, which speaks of latent defects. And the court in that case said under this statute, all you've got to know is the condition. But under our common law, you have to know of the specific risk presented by the condition in order for the defect not to be latent. You have testimony here that's unrebutted from our expert who indicated that this was a latent hidden defect on the site. It was unrebutted testimony from that witness who indicated that that was the case. And the unrebutted testimony of Richard Gill made it clear, I think, that this was a functionally hidden defect. And you have in this case no warnings on ramp controls to Shannon Adamson. You have no operating manual. The prepared instructions, according to our expert, again, were inadequate, failed to admit that Shannon Adamson never knew of the specific risk of collapse of the ramp in counsel's opening argument. This was a question of fact. The court concedes that the instruction was proper and it's a matter for the jury and the jury decided it the way the jury decided it. With respect to the lease covenants, the lease covenants here are broad and counsel would have this court believe you only need to focus on repair and this whole red herring about repair versus upgrade and blah, blah, blah. The fact of the matter is paragraph 4.7 is a broader statement of the obligation of the court to keep the premises free of structural or mechanical defects. That's a very broad obligation. That is not just a simple covenant to repair. The simple covenant to repair is 4.1. They had an obligation, an affirmative obligation to keep the premises free of structural or mechanical defects. And the lack of an interlock on the ramp controls in this case was patently a structural or mechanical defect. The jury had no difficulty concluding that that was true. It was unrebutted and it was Gerald Schaefer's testimony, again, in response to the question of . . . The district, their argument is the district court excluded extrinsic evidence which is allowed under Washington Supreme Court law. Well, counsel is, I think, generous with respect to Washington law. The first, their opening brief talked about Berg, a case that was dramatically restricted in subsequent cases by the Washington Supreme Court regarding extrinsic evidence, context evidence. Washington is an objective manifestation state. You look to the popular, ordinary, you know, usual interpretation of words . . . So you're saying extrinsic evidence is not allowed? Extrinsic evidence is not allowed if it's extrinsic evidence designed to . . . Not allowed, period? Or it's not allowed? It's not allowed if it's evidence that's designed only to afford a party to express a subjective intent regarding the contract. And if you look at the actual offer of proof by the court in this case, it's at Supplemental Excerpts of Record 526529, all of the testimony we're talking about was subjective intent. Well, what we really wanted to do in that contract was blah, blah, blah, blah, blah. The trial court was perfectly attuned to this issue and excluded that evidence for that reason. It was totally subjective intent. The jury was perfectly able to decide what the ordinary, reasonable meaning of the word repair was or maintain premises free of structural or mechanical defects. And it did. And the jury's verdict should be upheld. Thank you. Thank you very much. I think, Mr. King, we've got some time for your rebuttal, please. First about what the lease says. You're told Section 5.18 gives the port the absolute right to enter whenever. Nope, that's not true. ER 348, the lessor is permitted to enter upon the premises at all reasonable times to examine the condition of saying. Well, interfering with the ferry system's operation would obviously not be a reasonable time. You're also told about the operating manual clause, which is Section 4.5 ER 344. All that clause did was at the start of the lease hand over this operating manual and provide guidelines. The question is whether then they could come on and dictate, oh, you're not doing this right, that right, or the other thing. Could you actually exercise control? I'm not going to repeat the references to the record that we provided in the brief. The fact of the matter is you could not do that in this situation. We could not do that. Now, source of duty and public policy. A FOA has become huge here. The leases, of course, weren't discussed because the airlines weren't a factor. What mattered was how to classify Mr. AFOA. Was he a licensee or was he a business invitee? Then the question becomes how broadly do you interpret this case? And I will just refer the Court to this language. After all of the control is described, after the pervasive control is described actually the phrase pervasive comes immediately after this paragraph. Justice Wiggins wrote, to the extent other cases arise in the future, liability should depend upon similar factors. This narrow holding limits concerns raised by amnesty, the specter of unintended liability for municipal corporations and other licensors. You know the record. We do not come with any hailing distance of the facts of AFOA. The Washington Supreme Court would not want you to extend it. Two things about cases. Was Hughes overruled in McKinnon? No. McKinnon concerned whether to adopt the public invitee as well as business invitee rule on the premises liability side. And I will close finally, if I may, with one comment. Judge Gould, you asked about how much would it have cost to fix this. I know we have a bad fact. People are offended by the fact that we didn't send the Geiger report. That we just didn't do it. But morality and best conduct is not the issue in this case. It is the law of the state of Washington and this law is really strict and they didn't make out their case. At best they get a retrial on contract only. Thank you. Thank you very much. We appreciate the excellent advocacy by counsel on both sides of the case. In the case of Adamson versus the port shall be submitted. Thank you.
judges: Gould, Ikuta, Tunheim